RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

OPAWL - BUILDING AAPI FEMINIST LEADERSHIP;
NORTHEAST OHIO COALITION FOR THE HOMELESS;
ELISA BREDENDIEK; PETER QUILLIGAN; JOHN
GERRATH,

　　　　　　　　　　　*Plaintiffs-Appellees*,

　　　*v.*

DAVE YOST, in his official capacity as Ohio Attorney
General; FRANK LAROSE, in his official capacity as
Ohio Secretary of State,

　　　　　　　　　　　*Defendants-Appellants*.

⎫
⎪
⎪
⎪
⎬  Nos. 24-3768
⎪
⎪
⎪
⎭

On Motion for Stay Pending Appeal.
United States District Court for the Southern District of Ohio at Columbus.
No. 2:24-cv-03495—Michael H. Watson, District Judge.

Decided and Filed:  October 8, 2024

Before:  McKEAGUE, THAPAR, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ON MOTION AND REPLY:**  T. Elliot Gaiser, Michael J. Hendershot, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants.  **ON RESPONSE:** Elisabeth
C. Frost, Jyoti Jasrasaria, Melinda K. Johnson, ELIAS LAW GROUP LLP, Washington, D.C.,
C. Benjamin Cooper, Kaela King, COOPER ELLIOTT, Columbus, Ohio, for Appellees.
**ON BRIEF:**  Jason Walta, Philip A. Hostak, NATIONAL EDUCATION ASSOCIATION,
Washington, D.C., Nathan Johnson, THE OHIO ENVIRONMENTAL COUNCIL, Columbus,
Ohio, for Amici Curiae.

　　　THAPAR, J., delivered the opinion of the court in which McKEAGUE, J., joined.
DAVIS, J. (pp. 21–32), delivered a separate dissenting opinion.

_____

**OPINION**

_____

THAPAR, Circuit Judge.  Ohio passed a law to stop foreign money from influencing its elections.  The law bans foreign nationals from spending money to support or defeat ballot initiatives.  It also bans foreign nationals from contributing to candidates in state elections.

After plaintiffs brought a First Amendment challenge, the district court found that Ohio's law violates the rights of lawful permanent residents.  The district court preliminarily enjoined Ohio from enforcing its new campaign finance law with respect to all foreign nationals.  Ohio appealed the district court's decision.  It also asked us for an emergency stay of the district court's order so that Ohio can enforce its law while we consider the merits of the appeal.  Because our initial review suggests that the district court's First Amendment analysis was flawed, we now grant Ohio's motion for a stay of the district court's order.

I.

After a referendum in 2023, Ohio became concerned that foreign money was pouring into its elections.  Mot. for Stay at 3.  So earlier this year, Ohio passed a law ("Section 121") scheduled to take effect on September 1 banning "foreign nationals" from making political expenditures or contributions "in support of or opposition to a candidate for any elective office." Ohio Rev. Code Ann. § 3517.121(B)(1).  The law also bans expenditures and contributions "in support of or opposition to a statewide ballot issue or question." *Id.* § 3517.121(B)(2).

Section 121 defines "foreign national" to mean, in part, "an individual who is not a United States citizen or national." *Id.* § 3517.121(A)(2)(a).  And under Ohio law, a "contribution" is a transfer of "anything of value" to a third party when that transfer is "made, received, or used for the purpose of influencing the results of an election." *Id.* § 3517.01(A)(5).  Payments made to produce or air electioneering communications don't count as contributions. *Id.* § 3517.01(A)(5)(e).  An "expenditure" is a "disbursement or use of a contribution for the purpose of influencing" election results, or a "charitable donation" under § 3517.08(G). *Id.* § 3517.01(A)(6).  An "independent expenditure" is "an expenditure by a person advocating the

election or defeat of an identified candidate or candidates, that is not made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of any candidate or candidates or of the campaign committee or agent of the candidate or candidates." *Id.* § 3517.01(A)(17).

Ohio is not alone in its concern about foreign influence on elections. The Federal Election Campaign Act ("FECA") also prohibits contributions and expenditures by foreign nationals. *See* 52 U.S.C. § 30121(a)(1). But as the district court noted, Section 121 differs from FECA in two relevant ways. First, Ohio's definition of "foreign national" includes lawful permanent residents. *See* Ohio Rev. Code Ann. § 3517.121(A)(2)(a). But FECA exempts lawful permanent residents from its prohibitions. *See* 52 U.S.C. § 30121(b)(2). Second, Section 121 prohibits contributions and expenditures related to ballot initiatives. *See* Ohio Rev. Code. Ann. § 3517.121(B)(2). FECA, on the other hand, applies only to contributions and expenditures related to candidate elections. *See* 52 U.S.C. § 30121(a)(1)(A).

Soon after Ohio enacted § 121, various plaintiffs challenged the law in federal district court on First Amendment grounds. They sought declaratory and injunctive relief. The plaintiffs are (a) two advocacy organizations who assert that they receive funding from non-citizens; (b) two non-citizen lawful permanent residents; and (c) a United States citizen who is married to one of the non-citizen plaintiffs and fears that contributing from the family's joint bank account would expose him to criminal liability.

The district court acknowledged that § 121 is constitutional as applied to foreign citizens who aren't lawful permanent residents. Yet it preliminarily enjoined Ohio from enforcing § 121 as to all "foreign national individuals," on the ground that the law violated the First Amendment rights of lawful permanent residents. R. 32, Pg. ID 1141. The court permitted Ohio to enforce the remainder of the law, including prohibitions on spending by foreign governments or political parties. *See* Ohio Rev. Code Ann. § 3517.121(A)(2)(b)–(d). In so doing, the court severed the definition of "an individual who is not a United States citizen or national" from § 121's definition of "foreign national." R. 32, Pg. ID 1189–90.

Ohio immediately appealed the preliminary injunction and asked the district court for a stay, which it denied.  One day later, Ohio petitioned the Sixth Circuit for a stay of the preliminary injunction.  We set an expedited briefing schedule and administratively stayed the district court's injunction.  Ohio's stay petition is now before us.

II.

Ohio's application for a stay of the district court's injunction pending appeal requires us to weigh four factors:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Notably, there is "substantial overlap" between the four factors governing the grant of a stay and the factors governing the initial grant of a preliminary injunction.  *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  But these two tests are "not . . . one and the same."  *Id.*  If we were asked to enjoin § 121 in the first instance, we would require "a significantly higher justification" than if we were merely staying an injunction.  *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (quoting *Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regul. Comm'n*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)).  Why?  Because by granting a stay, we halt the district court's own "judicial alteration of the status quo."  *Id.*  By contrast, to issue an injunction after the lower court had refused, we would "grant[] judicial intervention that has been withheld" by a lower court.  *Id.*  Therefore, a party seeking a stay on appeal faces a lower burden than one seeking an injunction on appeal.

A.

Before we get to the *Nken* analysis, we must address whether the *Purcell* principle applies.  *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).  *Purcell* teaches that federal courts must not alter election rules on the eve of an election.  *Id.*  But here, the district court enjoined Ohio's law just two months before the 2024 November election.  To be sure, courts have split on whether *Purcell* applies in the campaign finance context.  *Compare Lair v. Bullock*, 697 F.3d 1200, 1202, 1214 (9th Cir. 2012), *with Chancey v. Illinois State Bd. of Elections*, 635 F.

Supp. 3d 627, 644–45 (N.D. Ill. 2022).  But there are strong arguments that it should.  Campaign finance rules are key to the legal landscape that shapes our political contests.  Campaign finance law affects who can speak, how much they can speak, and what they can speak about.  That speech influences who and what is on the ballot—and voters' opinions about the candidates and the issues.  Section 121's restrictions thus form part of a "delicate campaign contribution equilibrium leading up to [Ohio's] imminent election." *Lair*, 697 F.3d at 1203–04.

Ultimately, however, we don't need to resolve whether *Purcell*'s admonition applies to federal-court injunctions of campaign-finance regulations, since we conclude that Ohio is entitled to a stay regardless.[1]

## B.

We now turn to likelihood of success on the merits.  In the context of First Amendment emergency motions, the merits analysis is often dispositive.  *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  Here, Ohio is likely to succeed on the merits.  Contrary to the district court's preliminary injunction analysis, Section 121 is not overbroad or otherwise facially invalid.

### i.

Plaintiffs claim that § 121 is overbroad.  The district court agreed.  It didn't dispute that § 121 is constitutional as applied to non-citizens who aren't lawful permanent residents.  After all, FECA already restricts the campaign spending of non-citizens who aren't lawful permanent residents—and those restrictions have been upheld.  *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012).  But the district

---

[1]In any event, the district court was wrong to suggest that *Purcell* might cut *against* Ohio.  According to the district court, it was § 121 that upset the legal status quo on the eve of an election: "The Court's injunction merely makes Ohio law consistent with the federal law and consistent with *what Ohio law has been*."  R. 40, Pg. ID 1277.  But *Purcell* constrains the equitable powers of the federal courts, not the sovereign powers of state legislatures.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) (explaining that "lower federal courts" must not alter rules for an upcoming election).  To reason that *Purcell* somehow constrains a state legislature's power to set rules would "turn *Purcell* on its head." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

court reasoned that § 121 was "overbroad insofar as it sweeps in [lawful permanent residents] and those who receive money from them." R. 32, Pg. ID 1188.

But even if the inclusion of lawful permanent residents in § 121 violates the First Amendment (it doesn't), that wouldn't make § 121 overbroad. In the First Amendment context, a successful overbreadth challenge requires the plaintiff to prove that the statute is substantially overbroad "relative to [its] plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008). "Invalidation for overbreadth is strong medicine that is not to be casually employed." *Id.* at 293 (citation omitted) (cleaned up). The district court proved too ready to administer this strong medicine. Lawful permanent residents comprise less than a quarter of the foreign-born population in the United States. *See* Mohamad Moslimani & Jeffrey S. Passel, *What the data says about immigrants in the U.S.*, Pew Rsch. Ctr. (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/key-findings-about-us-immigrants. And Ohio's contribution and expenditure bans extend to all non-citizens, not only those non-citizens who happen to be present on American soil. Therefore, the 11 million lawful permanent residents make up only about .14% of the people covered by the law. *Cf. U.S. and World Population Clock*, U.S. Census Bureau, https://www.census.gov/popclock/world. If only .14% of a law's applications are unconstitutional, the law is not substantially overbroad in relation to its plainly legitimate sweep.

To be sure, contributions and expenditures are speech, and overbreadth doctrine focuses on how much protected speech a law restricts. Of course, the district court did not rely on this type of theory—and for good reason. The plaintiffs never presented evidence that lawful permanent residents spend significantly more money on Ohio elections than other categories of foreign nationals. And the burden lies with the plaintiffs to show that § 121 sweeps too broadly. *See Virginia v. Hicks*, 539 U.S. 113, 122 (2003). Since the plaintiffs haven't met that burden, their overbreadth challenge fails.

ii.

Plaintiffs also argue the law is facially invalid because it unconstitutionally restricts the political speech of lawful permanent residents. To assess that claim, we must answer three

questions: (1) Do lawful permanent residents have First Amendment rights to begin with? (2) If they do, and if § 121 implicates those rights, what tier of scrutiny applies? (3) And does § 121 satisfy the applicable tier(s) of scrutiny?

(1) Lawful permanent residents have First Amendment rights. The Supreme Court has long held that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). To be sure, more recent precedent construing references to "the people" in the Bill of Rights—including in the First Amendment, *see* U.S. Const. amend. I, cl. 3—hasn't been so categorical. The Supreme Court has suggested "that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Lawful permanent residents aren't citizens. But they have developed sufficient connections with the United States to be considered a part of the national community: They live and work here lawfully, and they can serve in the military. *See Bluman*, 800 F. Supp. 2d at 291; *cf.* 50 U.S.C. § 1801(i) (explaining that lawful permanent residents are included in "United States persons").

Here, Section 121 regulates the expressive activity and associational freedoms of lawful permanent residents because it regulates their campaign-related expenditures and contributions. *See Buckley v. Valeo*, 424 U.S. 1, 16–23 (1976). Because lawful permanent residents have First Amendment rights, Section 121 triggers First Amendment scrutiny.

Ohio, for its part, contends that there's no need to subject § 121 to First Amendment scrutiny because "noncitizens do not have a constitutional right to participate in the machinery of voting in the first instance." Mot. for Stay at 12. That's true. *See Bluman*, 800 F. Supp. 2d at 287–88. But it doesn't alter Supreme Court precedent holding that noncitizens like lawful permanent residents enjoy First Amendment rights. *See Wixon*, 326 U.S. at 148.

(2) What tier of scrutiny should apply to § 121? Political expenditures and contributions are "acts of political expression and association protected by the First Amendment." *Bluman*, 800 F. Supp. 2d at 285. So presumably we'd apply the traditional tiers of scrutiny to the

campaign finance regulations at issue:  Expenditure limits trigger strict scrutiny, while contribution limits trigger a form of intermediate scrutiny.  *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014).  But § 121 regulates the speech of foreigners with regard to the processes of self-government.  Foreigners fall outside the community that's entitled to participate in the democratic process.  *See Bluman*, 800 F. Supp. 2d at 287.  That suggests that a lesser level of scrutiny could apply to § 121 than with traditional campaign finance regulations.

However, we decline to resolve what tier of scrutiny applies, because § 121 passes muster even under the regular forms of scrutiny for campaign finance regulations.  *See id.* at 285.  Thus, we may assume for the sake of argument that Ohio's ban on expenditures by foreign nationals, including lawful permanent residents, is subject to strict scrutiny.  Likewise, we will assume that § 121's restrictions on contributions must withstand *Buckley*'s form of intermediate scrutiny.  Under that test, Ohio must "demonstrate[] a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgement of associational freedoms."  *Buckley*, 424 U.S. at 25.  Section 121 passes both tests.

(3) To withstand strict scrutiny, a law must be "narrowly tailored to serve a compelling interest."  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442 (2015).  Strict scrutiny is "a demanding and rarely satisfied standard."  *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.).  But it's not "fatal in fact.'"  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).  Indeed, the Court has repeatedly upheld laws after subjecting them to strict scrutiny, including in the campaign-finance context.  *See Williams-Yulee*, 575 U.S. at 444 (collecting cases).  Here, Ohio's expenditure limits clear this high bar.

\*

What "compelling interest" does Ohio assert?  "[P]reventing noncitizens from pouring money into Ohio's elections."  Mot. for Stay at 15–16.  That's a compelling interest—and the court below acknowledged as much.  As the *Bluman* court held, the government has a compelling interest "in preventing foreign influence over U.S. elections."  800 F. Supp. 2d at 288 n.3.  That conclusion is unsurprising:  The Supreme Court has repeatedly instructed that states

have significant leeway in protecting their democratic processes from the influence of non-citizens.

Indeed, the "exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). States can prevent non-citizens from serving as probation officers, *see id.*, or teaching in public schools, *see Ambach v. Norwick*, 441 U.S. 68 (1979). Why? Because the "distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State." *Id.* at 75. "It is because of this special significance of citizenship that governmental entities, when exercising the functions of government, have wider latitude in limiting the participation of noncitizens." *Id.* So, excluding non-citizens from certain activities can advance a compelling interest when those activities form part of the "the process of democratic self-government." *Bluman*, 800 F. Supp. 2d at 287.

Campaign contributions and independent expenditures are part of our process of democratic self-government. Under Supreme Court precedent, the activities of self-government "include functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers." *Id.* at 288 (citations omitted). "[S]pending money to influence voters and finance campaigns is at least as (and probably far more) closely related to democratic self-government than serving as a probation officer or public schoolteacher." *Id.* at 288–89. It's thus unsurprising that the dissenters in *Citizens United* emphasized that the Court has "never cast doubt on laws that place special restrictions on campaign spending by foreign nationals." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 423 (2010) (Stevens, J., concurring in part and dissenting in part). For this very same reason, courts have upheld large-donor disclosure requirements because, in part, they help "ensure that foreign nationals . . . do not seek to influence United States' elections." *Indep. Inst. v. Fed. Election Comm'n*, 216 F. Supp. 3d 176, 191 (D.D.C. 2016), *aff'd*, 580 U.S. 1157 (2017); *see also SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 698 (D.C. Cir. 2010).

Plaintiffs, for their part, take issue with the fact that § 121 extends to advocacy surrounding ballot initiatives. They argue that spending related to ballot issues falls outside

democratic self-government. But, as the district court concluded, advocacy around ballot initiatives is even more connected to the democratic process than advocacy for or against a candidate. Ballot initiatives are the quintessential form of direct democracy. Indeed, the Ohio Supreme Court has referred to Ohio's initiative process as "precious and fundamental." *City of Middletown v. Ferguson*, 495 N.E.2d 380, 388 n.4 (Ohio 1986).

Ohio's compelling interest in preventing foreign influence over its elections encompasses the influence of lawful permanent residents. Discussing who the government can exclude from the processes of self-government, the Supreme Court has drawn the relevant distinction between citizens and non-citizens. *Cabell*, for example, distinguished between "aliens" and United States citizens, 454 U.S. at 439, and *Ambach* focused on "noncitizens," 441 U.S. at 75. Lawful permanent residents fall on the non-citizen side of that dividing line.

*Bluman* supports this reading. It focused on the exclusion of "foreign citizens" from the democratic process. 800 F. Supp. 2d at 287. And the statute at issue served "the compelling interest of limiting the participation of *non-Americans* in the activities of democratic self-government." *Id.* at 290 (emphasis in original). The compelling interest identified by the Supreme Court amounts to preventing influence by all those without American citizenship, including lawful permanent residents, over America's "process of democratic self-government." *Bernal v. Fainter*, 467 U.S. 216, 220 (1984).

The district court cited several features of lawful permanent residents that distinguish them from other non-citizens: indefinite residency in the United States, ability to serve in the military, registration with the Selective Service, and payment of income taxes. But none of these aspects of lawful permanent residency alters our analysis.

Indefinite residency is a privilege given to lawful permanent residents by the United States government. Indeed, the Supreme Court has observed that "protract[ing] this ambiguous status within the country is not [an alien's] right but is a matter of permission and tolerance." *Harisiades v. Shaughnessy*, 342 U.S. 580, 586–87 (1952). In other words, the United States government decided to give lawful permanent residents the privilege of indefinite residency.

That decision by the federal government doesn't bear on Ohio's compelling interest in safeguarding its elections from foreign influence.

To be sure, permitting military service for lawful permanent residents conveys a high degree of trust. *See* 32 C.F.R. § 66.6(b)(2)(i). But Congress' determination that certain lawful permanent residents may serve in the military has no bearing on their constitutional status for purposes of campaign finance regulations. Indeed, the Constitution explicitly gives Congress the power to "provide for organizing, arming, and disciplining, the Militia." U.S. Const. Art. I, § 8, cl. 16. Moreover, Congress didn't give all lawful permanent residents the right to serve. Rather, the Department of Defense has implemented extensive procedures to screen lawful permanent residents before they can join the military. *See DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program*, U.S. Dep't of Defense (Oct. 13, 2017), https://www.defense.gov /News/Releases/Release/Article/1342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/. No such screening process guards against the money expended by lawful permanent residents that sloshes around in Ohio elections. Ohio's new law provides one.

Further, the fact that some lawful permanent residents must register for the Selective Service and pay income taxes doesn't affect Ohio's compelling interest. Lawful permanent residents' duties to pay taxes and register for the Selective Service are part and parcel of the bargain they've struck with the United States to remain here. They enjoy the unrivaled benefits of United States residency, including many of the protections of the Bill of Rights. What's more, all foreign citizens working in the United States must pay taxes. And the fact that lawful permanent residents must register for the Selective Service doesn't detract from Ohio's compelling interest in preventing foreign influence in its elections.

In sum, the Supreme Court's approval of excluding foreigners from the process of self-government applies with full force to Ohio's restrictions on lawful permanent residents' political spending. "The statute does not serve a compelling interest in limiting the participation of *non-voters* in the activities of democratic self-government; it serves the compelling interest of limiting the participation of *non-Americans* in the activities of democratic self-government."

*Bluman*, 800 F. Supp. 2d. at 290 (emphasis in original). By definition, lawful permanent residents are not American citizens. Therefore, we have no trouble concluding that Ohio has a compelling interest in preventing foreign influence in its elections and that Ohio's interest extends to preventing independent expenditures by non-citizens.

Lower court precedent invalidating state campaign finance laws restricting the political speech of citizens from other states isn't to the contrary. Unlike § 121, since those laws involve citizens, they must advance a permissible anti-quid pro quo corruption interest. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022). Usually, those cases involve states trying to prevent citizens from other states influencing their elections. That isn't permissible since it doesn't go to quid pro quo corruption. *See Thompson v. Hebdon*, 7 F.4th 811, 824–27 (9th Cir. 2021). But the fact that Alaska's restrictions on the political spending of Texans fail to advance a legitimate anti-corruption interest says nothing about whether Ohio's restrictions on the political spending of Russian citizens fail to advance an independently legitimate interest in guarding against foreign influence over U.S. elections. *See Bluman*, 800 F. Supp. 2d at 288 n.3.

\* \*

Next, we ask whether Ohio's independent expenditure limits are narrowly tailored to its compelling interest. The court below upheld Ohio's ban on expenditures by foreign nationals who aren't lawful permanent residents. But the district court concluded that the law's ban on expenditures by lawful permanent residents fails narrow tailoring. We disagree. Section 121 advances Ohio's interest in guarding against foreign influence as applied to lawful permanent residents and is backed by sufficient evidence. And it's neither overinclusive nor underinclusive.

Ohio has demonstrated a sufficient evidentiary link between its restriction on the political speech of lawful permanent residents and its compelling interest in preventing foreign influence in elections. To satisfy the narrow tailoring requirement of strict scrutiny, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." R. 32, Pg. ID 1178 (quoting *United States v. Alvarez*, 567 U.S. 709, 725 (2012)). But the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will

vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000).

Ohio's justification for § 121 is neither novel nor implausible. Worries about foreign influence in American politics date back to the Founding. *See, e.g.*, George Washington, *Farewell Address* (Sept. 17, 1796), *in* 1 A Compilation of the Messages and Papers of the Presidents, 1789-1907, at 214 (James D. Richardson ed., 1908) (worrying about "foreign influence" that "tamper[s] with domestic factions"). And the prohibition on foreign contributions to political campaigns originated with the amended Foreign Agents Registration Act. *See* Pub. L. No. 89–486, § 8, 80 Stat. 244, 248–49 (1966). Those restrictions soon became part of the Federal Election Campaign Act of 1974. *See* Pub. L. No. 93–443, § 101(d), 88 Stat. 1263, 1267. Then, in 2002, mounting concerns about foreign financial involvement in American elections led to a ban on contributions and expenditures by foreign nationals. *See* Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107–155, § 303, 116 Stat. 81, 96.

Worries about foreign influence in American elections have escalated in recent years. As a result, other states have also sought to restrict the influence of foreigners in their elections. *See, e.g.*, Minn. Stat. Ann. § 211B.15(4a).[2] Likewise, Supreme Court cases for over half a century have blessed efforts by states to restrict foreign citizens from participating in democratic processes. *See Bluman*, 800 F. Supp. 2d at 287–88 (collecting cases). In short, Ohio's rationale of preventing foreign interference in state elections has a strong pedigree in American political history, and that fact reduces its evidentiary burden under the strict scrutiny analysis.

Given this tradition of government regulation, Ohio has met its evidentiary burden for purposes of strict scrutiny. Ohio cites ample evidence of foreign money being spent on statewide elections and referenda. Before § 121's passage, Ohio couldn't detect the individual sources of foreign money because the recipient organizations spending the money "did not need to report the identity of their donors." Katz Decl., R. 29-3, Pg. ID 1094. This created an "untraceable

---

[2]And congressional bills have proposed broadening the definition of "foreign national" under federal law to include lawful permanent residents. *See, e.g.*, Jessica S. Horrocks, *Campaigns, Contributions and Citizenship: The First Amendment Right of Resident Aliens to Finance Federal Elections*, 38 B.C. L. Rev. 771, 774 (1997) (citing one such 1997 proposal).

influx of foreign money meant to influence the outcome of American political processes." *Id.* This money may have been flowing from lawful permanent residents; it may not have. Ohio couldn't tell.

Stuck between a rock and a hard place, Ohio opted to draw "bright lines to prevent foreign-national participation in Ohio's self-government processes." *Id.* at 1095. By including lawful permanent residents, Ohio sought to apply "its definition of foreign national comprehensively . . . to *all* non-citizens" and to be "clear about its reach." *Id.* (emphasis in original). Ohio had good reason to include lawful permanent residents within its regulatory purview.

Further, Ohio has provided enough evidence of the law's necessity given the leeway states enjoy in addressing potential interference in their elections. The Supreme Court has noted that states' "interest in preserving the integrity of the electoral process" is "compelling." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986). After all, "protecting public confidence in elections is deeply important—indeed, critical—to democracy." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality opinion)).

To this end, we've recognized that "solicitude for state sovereignty regarding elections mitigates the evidentiary burden a State must satisfy" to clear strict scrutiny. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1053 (6th Cir. 2015). That makes sense: Just as "information can be difficult to obtain and the impact of certain conduct difficult to assess" when making "efforts to confront evolving [foreign] threats," so too is information difficult to gather when making efforts to preserve election integrity from foreign influence. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). "In this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government." *Id.* at 34–35.

And the Supreme Court has recognized that state laws advancing foundational yet abstract interests like the public's confidence in its government will rarely rest on hard evidence. In upholding a state restriction on the solicitation of campaign donations by judicial candidates,

the Court explained that "[t]he concept of public confidence in judicial integrity does not . . . lend itself to proof by documentary record." *Williams-Yulee*, 575 U.S. at 447. Indeed, the state had not identified any evidence "that banning requests [by judges] for contributions will substantially improve public trust in judges." *Id.* at 466 (Scalia, J., dissenting). Yet the state's solicitation ban survived strict scrutiny because a "state may assure its people that judges will apply the law without fear or favor—and without having personally asked anyone for money." *Id.* at 438 (majority opinion).

So too here: Ohio can take steps to assure its people that foreign interests haven't unduly swayed its elections without abundant "proof by documentary record." *Id.* at 447. Addressing a widespread perception of foreign interference makes "perfect sense." *Nixon*, 528 U.S. at 390. "Leave the perception of impropriety unanswered, and the cynical assumption that [foreign] donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Id.* Thus, contrary to the district court's finding, Ohio met its burden of linking spending by lawful permanent residents to preventing foreign interference in Ohio's elections.[3]

Similarly, to maintain public confidence in fair elections, the Court has permitted states "to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro*, 479 U.S. at 195. For example, the Supreme Court has recognized that because "[e]lections vary from year to year, and place to place," it can be "difficult to make specific findings about the effects of a voting regulation." *Burson v. Freeman*, 504 U.S. 191, 209 (1992). As a result, requiring precise proof of those effects "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Munro*, 479 U.S. at 195. So too with a campaign finance restriction: quantifying the precise effects of non-citizens' political expenditures is all but impossible.

---

[3]The dissent believes that because Ohio is the first state to include lawful permanent residents in its definition of foreign nationals, the law is doomed. *See* Dissent at 26. It's true that a regulation's novelty can sometimes serve as circumstantial evidence of its unconstitutionality. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505–06 (2010). But a regulation might also be new because it addresses new facts. If the new regulation—like § 121—responds to new realities (like heightened worries about foreign influence on our elections) in the service of time-honored goals (like preventing foreign influence on our elections), that's a good indication that its novelty isn't evidence of any unconstitutionality.

The dissent's demand for more hard evidence misses the point of strict scrutiny's evidentiary hurdles. *See* Dissent at 23, 26. We normally demand evidence of the supposed problem a law solves and how the law goes about solving it to ensure that the law isn't suppressing more speech than necessary. But sometimes we don't need that empirical proof. Why? Because doing so would be demanding evidence of the obvious. There's no doubt that Ohio has a valid interest in preventing non-citizens from influencing its elections, and there's no doubt that § 121 advances that interest. The Constitution and common sense aren't enemies. Strict scrutiny demands reasons and tightly drawn lines, not official findings of facts that we already know to be true.[4]

Just as § 121 doesn't fail narrow tailoring for lack of evidentiary support, so too does it satisfy narrow tailoring with respect to its means-ends fit. To begin with, Section 121 is not overinclusive since it doesn't restrict more speech than necessary.

Plaintiffs argue that the law is overinclusive because it's "far too sweeping." Response at 11. They maintain that § 121 would proscribe seemingly innocuous conduct, including "incidental expenditures for a yard-sign that expresses a view on state or local politics." *Id.* at 12 (quoting R. 32, Pg. ID 1182). That's incorrect. Section 121 doesn't bar anyone from *posting* yard-signs. It only applies to the *purchase* of a yard-sign. Thus, this provision plugs a loophole by which a non-citizen could, say, buy a yard-sign for $20,000 and circumvent Ohio's other spending prohibitions. This prohibition doesn't sweep too broadly. Ohio's law still allows homemade yard-signs. And it allows a non-citizen to receive a yard-sign and place it on his lawn. At bottom, Ohio set out to prevent foreign influence in state elections by preventing foreign influence in state elections. Nothing could be more narrowly tailored.

The district court also deemed Ohio's restrictions on lawful permanent residents' political speech overinclusive because § 121 swept in American citizens who share finances with

---

[4]The dissent points to *United States v. Alvarez*, 567 U.S. 709 (2012), in support of its demand for hard evidence. Dissent at 27 n.6. But in *Alvarez*, the alleged "common sense" justification that the government offered in support of the Stolen Valor Act was speculative: It didn't necessarily follow that "false representations have the tendency to dilute the value and meaning of military awards." *Alvarez*, 567 U.S. at 726 (quoting Br. for United States at 54). So, the Supreme Court demanded hard evidence in support of this speculative argument. *Id.* Not so here: It does directly follow that preventing foreign spending on Ohio elections helps prevent foreign influence on Ohio elections.

non-citizens.  But § 121 doesn't sweep in the speech of citizens who share finances with non-citizens.  Ohio confirmed that the law "does not bar a citizen from making expenditures or contributions from an account shared with a lawful permanent resident."  Mot. for Stay at 14.  For example, Ohio regulations treat contributions made from joint accounts as contributions "by the person signing or endorsing the joint check or other written instrument," "[a]bsent evidence to the contrary."  *Id.* (quoting Ohio Admin. Code 111:2-4-14).  In short, Ohio has made careful exceptions to § 121 and ensured it does "not suppress lawful speech as the means to suppress unlawful speech."  *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

Plaintiffs counter that Ohio's administrative code doesn't alter its campaign finance laws or the Attorney General's enforcement authority.  True, but irrelevant.  Ohio expressly conceded that its laws wouldn't apply to a citizen who shares a bank account with a non-citizen and spends money on a political campaign from the shared account.  Ohio would be judicially estopped from enforcing § 121 under those circumstances.  *See New Hampshire v. Maine*, 532 U.S. 742, 745 (2001).

The same goes for Ohio's regulation of ballot advocacy along with advocacy for or against a candidate.  FECA only prohibited the latter.  But FECA's limited scope doesn't render Ohio's law overinclusive.  In fact, FECA was challenged as *under*inclusive for not covering ballot advocacy.  *See Bluman*, 800 F. Supp. 2d at 290–91.  Overinclusive if you do, underinclusive if you don't.  The First Amendment doesn't create that dilemma.

Nor is § 121 overinclusive because it extends to lawful permanent residents in the first place.  Indeed, Congress has contemplated this extension but never enacted it.  *See supra* note 2.  From this, the dissent reasons that less burdensome alternatives exist for advancing Ohio's interest in preventing foreign influence over its elections—namely, a FECA-like regulation that doesn't include lawful permanent residents.  Dissent at 27.  But narrow tailoring in the context of strict scrutiny only requires the government to use the least restrictive means that still allow it to achieve its compelling interest.  Strict scrutiny doesn't demand that the government sacrifice its compelling interest.  We can't invalidate a law because the government could've adopted a different approach that advances its compelling interest less effectively.  If the goal is to prevent foreign influence, extending the ban to all non-citizens (including lawful permanent residents) is

the most effective means of advancing that goal. Congress was free to strike a balance that was less comprehensive for the sake of advancing other goals, such as honoring lawful permanent residents' deep ties to the United States. Ohio is similarly free to strike its own balance; FECA isn't the only constitutionally permissible way to counter foreign influence in American elections.

Relatedly, amici worry that § 121 forces non-profits and unions to implement burdensome measures to segregate contributions from foreign nationals to ensure that such donations aren't used for electioneering. *See* Ohio Educ. Ass'n Br. at 8; Ohio Env't Council Br. at 14. While that may be true, an administrative burden can't overcome Ohio's interest in safeguarding its elections from foreign interference. And as Ohio points out, nonprofits and unions already must comply with a host of state and federal reporting obligations when they solicit donations. *See, e.g.*, Ohio Rev. Code Ann. §§ 109.31, 1716.05, 4117.19; 26 U.S.C. § 6033(b).

Amici also express concerns about the costs of unverified complaints and mandatory investigation by the Attorney General. *See* Ohio Rev. Code Ann. § 3517.121(G)(1), (2); *see also* Ohio Env't Council Br. at 12–13. But a private party's abuse of a law doesn't make the law unconstitutional, just as a prank 911 call doesn't make an emergency response unlawful. And Ohio would bear the costs of investigating and responding to frivolous complaints just as much as amici would.

Similarly, Ohio's restriction on lawful permanent residents' ability to make independent expenditures isn't underinclusive. In concluding otherwise, the district court was right on the law and wrong on its application. "[U]nderinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes." R. 32, Pg. ID 1183 (citation and quotation omitted). A law cannot claim to protect "an interest of the highest order," but then "leave[] appreciable damage to that supposedly vital interest unprohibited." *Id.* (citation omitted).

So why did the district court find § 121 underinclusive? Because § 121 fails to restrain political speech by foreign-owned American corporate entities, which purportedly "pose a much

higher risk of undue foreign influence" than lawful permanent residents. *Id.* at 1184–85. In response, Ohio points out that such a ban could run afoul of Supreme Court precedent. Ohio is correct: *Citizens United* suggested that a law would be "overbroad" if it restricted corporate speech beyond corporations "that were created in foreign countries or funded predominantly by foreign shareholders." 558 U.S. at 362. Any such law might unduly restrict the free speech rights of American citizen shareholders. Indeed, a district court recently enjoined a law that restricted political contributions from "foreign government-influenced" entities with "5% or more of the total equity" or "other applicable ownership interests" owned by foreigners. *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, 2024 WL 866367, at *2 (D. Me. Feb. 29, 2024) (quoting 21 A.M.R.S. § 1064(2)). Regardless of whether that decision was correct, Ohio raises a valid point that *Citizens United* jeopardizes potential prohibitions on speech by certain foreign-owned corporations. Therefore, Ohio's focus on expenditures by lawful permanent residents wasn't underinclusive.[5]

In sum, Section 121 "serves the compelling interest of limiting the participation of non-Americans in the activities of democratic self-government. A statute that excludes [lawful permanent residents] from political spending is therefore tailored to achieve that compelling interest." *Bluman*, 800 F. Supp. 2d at 290 (emphasis omitted). Ohio's restriction on expenditures by lawful permanent residents is justified by a compelling government interest and is narrowly tailored in pursuing that interest. It survives strict scrutiny.

\* \* \*

All these considerations apply with equal force to Ohio's contributions ban. Ohio retains its compelling interest in preventing foreign influence over its elections, and the contributions ban is "closely drawn" to advance that interest for the same reasons the expenditures ban survives narrow tailoring. *Buckley*, 424 U.S. at 25. Just as Ohio's expenditure ban survives

---

[5]The dissent points out that § 121 allows corporations with some foreign influence to spend money in elections but not domestic non-profit organizations that receive money from non-citizens. Dissent at 29. But the dissent misses a key distinction: Shareholders are owners of a corporation, while donors merely contribute to a non-profit. So non-profits can segregate funds from non-citizen donors but corporations can't cordon off non-citizen shareholders.

strict scrutiny, it follows that its contribution ban withstands *Buckley*'s lesser form of review for contribution regulations.

## C.

Moving onto the second *Nken* factor, we conclude that Ohio will be irreparably harmed absent a stay of the injunction. The "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). At the same time, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). These competing claims to irreparable injury both point back to the importance of the merits inquiry in this context. *Cf. Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (noting the same in the preliminary injunction context with respect to First Amendment challenges).

## D.

The third and fourth *Nken* factors—whether issuing a stay will substantially injure the other parties interested in the proceeding and where the public interest lies—"merge" when the government is a party. *Nken*, 556 U.S. at 435. And again, they hinge on the merits here: It's in the public interest to prevent violations of constitutional rights. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). But it's equally in the public interest to give "effect to the will of the people by enforcing the laws they and their representatives enact," absent a constitutional issue. *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) (quotation omitted).

\*     \*     \*

The state of Ohio passed a law restricting the ability of foreign nationals to contribute to state campaigns and make independent expenditures related to state ballot initiatives. Concerns about foreign interference in American politics aren't new. And Ohioans and their representatives have a compelling interest in regulating such influence. We can't interfere with their judgment unless the First Amendment demands it. And here, it doesn't.

We accordingly grant Ohio's motion and stay the district court's injunction.

———————————

**DISSENT**

———————————

DAVIS, Circuit Judge, dissenting.  Ohio's § 121 is unlikely to pass constitutional muster applying either strict or intermediate scrutiny.  The state is therefore unlikely to prevail on the merits and a stay of the district court's grant of injunctive relief is not warranted.  For this reason, I disagree with my colleagues and respectfully dissent.

To begin, § 121 distinguishes itself from federal restrictions on campaign contributions and expenditures under the parallel Federal Election Campaign Act ("FECA") in one constitutionally important way: it defines "foreign national" more broadly than the term is defined in identical contexts.  Unlike FECA, § 121 includes lawful permanent residents ("LPRs") in its definition of foreign national.  *Compare* 52 U.S.C. § 30121(a)(1) *with* Ohio Rev. Code Ann. § 3517.121(A)(2)(a).  In defining foreign nationals this way, the law directly burdens LPRs's First Amendment rights.  And beyond that, the law implicitly burdens United States citizens based on certain affiliations with LPRs as well as advocacy organizations with LPR members in ways that create uneven regulation of speech when compared to corporations.

United States citizens and lawful permanent residents have First Amendment rights.  *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded aliens residing in this country.").  And I agree with my colleagues' observation that Ohio's statutory regulation of independent expenditures and campaign contributions constitutes a restriction on speech. *See Buckley v. Valeo*, 424 U.S. 1, 16-23 (1976).  As such, § 121 necessarily receives First Amendment scrutiny.  The questions that remain, then, are what type of scrutiny should apply and whether Ohio has met its burden under the appropriate level of scrutiny.  The answer to the latter question is where I respectfully part ways with the majority.

I.

A stay is an intrusion into the ordinary process of administration and judicial review. *Nken v. Holder*, 556 U.S. 418, 434 (2009).  In deciding whether to grant Ohio a stay, we must consider "traditional stay factors," which include: (1) whether the state has made a strong showing of its likelihood of success on the merits; (2) whether it will experience irreparable harm absent a stay; (3) the prospect that a stay would substantially injure other interested parties; and (4) the public interest in granting a stay.[1]  *Id*. at 426.  And the district court's grant of a preliminary injunction is reviewed for an abuse of discretion.  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  To obtain a stay, Ohio was required to show more than "the mere possibility of success."  *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

Ohio argues that it is likely to succeed on the merits because: (1) the state may exclude noncitizens from the mechanics of democratic self-government; and (2) the preliminary injunction is overbroad in that it blocks applications that are constitutional and reaches non-parties.  (Doc. 15, Mot., 8–21).  Both arguments fall short, leaving Ohio unlikely to prevail on the merits.  Given the substantial influence we typically ascribe to this first factor, a stay is not warranted.  *See Boone Cnty. Republican Party Exec. Comm. v. Wallace*, No. 24-5783, 24 WL 4048630, at *4 (6th Cir. Sept. 5, 2024) ("[I]n First Amendment cases, the outcome generally boils down to the [likelihood of success]."); s*ee also Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

II.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. 1.  That said, even First Amendment rights are not absolute.  *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996) ("While protecting First Amendment freedoms, we have, however, acknowledged that the First Amendment does not . . . guarantee absolute freedom of speech.").  Rather, when the

---

[1]*Nken's* prescription for a "strong showing," irrespective of whether the bar for a stay on appeal is lower than the bar for injunctive relief on appeal, underscores the fact that a stay is an extraordinary remedy.  *Nken*, 556 U.S. at 437 (Kennedy, J. concurring) (citing *Virginian R. Co. v. United States*, 272 U.S. 658, 672-673 (1926).

government passes laws that restrict First Amendment speech rights, courts consider the type of speech restricted, determine the appropriate level of scrutiny to apply, and examine whether the government has met its burden under the appropriate scrutiny. *See Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012).

Laws that abridge political speech are generally subject to, at least, intermediate scrutiny. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 228 (2014) (applying intermediate scrutiny and recognizing "[p]olitical speech [as] the primary object of First Amendment protection.") (Thomas, J., concurring); *Buckley*, 424 U.S. at 42 (1976) (applying the intermediate "closely drawn" test and identifying political expenditures and contributions as qualifying political speech).

The district court determined that § 121 is subject to intermediate scrutiny and that the statute fails that standard. The majority acknowledges that heightened scrutiny applies and posits that Ohio likely meets its burden regardless of whether the court applies strict scrutiny or intermediate scrutiny. I agree that we need not resolve which level of scrutiny applies, but for reasons that differ from the majority's; the statute is unlikely to meet either standard.

Strict scrutiny requires the state to prove that the challenged law is narrowly tailored to further a compelling government interest, and that there are no less restrictive alternatives available. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021), *see also Boone Cnty.*, 2024 WL 4048630, at *8 ("When considering whether a regulation or restriction is narrowly tailored to the interest asserted, we consider the availability of less restrictive alternatives."). Intermediate scrutiny, on the other hand, asks whether the law is closely drawn to further a sufficiently important government interest. *McCutcheon*, 572 U.S. at 197. To be clear, although the closely drawn standard is more intermediate scrutiny than it is strict, it is still a "rigorous" review. *Id.* at 199. To meet this burden, Ohio must do more than "simply posit the existence of the disease sought to be cured . . . It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (cleaned up). And "[b]road prophylactic rules in the area of free expression are suspect." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

A. *Section 121 Likely Fails Strict Scrutiny and Intermediate Scrutiny.*

*Government Interest.* The district court correctly concluded that Ohio has a "compelling interest in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). "Just as the Framers of the Constitution intended the states to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections . . . each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). And with that "historical power," the states' ability "to exclude aliens from participation in its democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of a political community." *Bluman*, 800 F. Supp. 2d at 287 (citing *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) (alteration in original)).

*Sufficient Tailoring to LPRs.* Accepting that states possess a general compelling interest in keeping foreign influences out of their political process, it is unlikely that a full bar against protected political speech of the sort restricted by § 121 is sufficiently tailored to serve the general aims of the state's interest. *Schickel v. Dilger*, 925 F.3d 858, 870 (6th Cir. 2019) (holding that having the requisite interest "is not enough; [states] must still demonstrate *how* its [provisions] further[] that interest.") (internal quotes omitted). Importantly, as regards governmental actions undertaken to serve the interest of preventing foreign influence in the U.S. political process, LPRs consistently have been treated differently from other noncitizens. *See Bluman*, 800 F. Supp. 2d at 290 ("Congress may reasonably conclude that lawful permanent residents of the United States stand in a different relationship to the American political community than other foreign citizens do [because they] have a long-term stake in the flourishing of American society [and] share important rights and obligations with citizens."); *McCutcheon*, 572 U.S. at 206 (refusing to apply interests that are "far too speculative.").[2]

---

[2]While Ohio certainly has a right to legislate with "foresight," caselaw has made clear that a government's proactive measures must be tied to evidence. *McCutcheon*, 572 U.S. at 206. The majority's reliance on *Munro* could benefit from its fuller context. *Munro* provides that states "should be permitted to respond to potential

This is understandable given LPRs's distinct status.[3]  Among other things, their First Amendment protected speech rights set them apart from other noncitizens and underscore their inclusion in the national community.  *Compare Bridges*, 326 U.S. at 148 (1945) (affirmatively extending First Amendment rights to LPRs), *with United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990) (reserving First Amendment protections for "a class of persons who are persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community") (citing *United States ex rel. Turner v. Williams*, 174 U.S. 279, 194 U.S. 292 (1904) (suggesting the exclusion of nonresident immigrants from First Amendment protections).

Indeed, our government has passed and adjudicated laws respecting federal elections that seek to protect the same interests Ohio has identified here without implicating LPRs at all.  *See, e.g.,* 52 U.S.C. 30121(b) (excluding United States citizens and lawfully admitted permanent residents from the definition of foreign national for the purposes of campaign contributions); *Bluman*, 800 F. Supp. 2d at 288; *see also United States v. Kanchanalak,* 192 F.3d 1037, 1048 (D.C. Cir. 1999) (ensuring that "United States citizens *and permanent residents* are not conduits for soft money that originates with foreign nationals.") (emphasis added); 11 C.F.R. § 110.20.[4]

That is because LPRs have a lawful, though conditional, right to live in the United States permanently, and they have a different relationship with this country than do other groups of noncitizens.  LPRs share in many of the responsibilities, and the rights, of United States citizens.  For instance, LPRs register for selective service in the United States military, pay taxes and they

---

deficiencies in the electoral process with foresight rather than relatively, *provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.*"  *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) (emphasis added).  § 121's total ban on LPR contributions is a significant abridgment of their First Amendment rights, evidenced by the rigorous scrutiny assessments required.  *McCutcheon*, 572 U.S. at 199; *Cruz*, 596 U.S. at 307.

[3]U.S. Citizenship and Immigration Services, *Rights and Responsibilities of a Green Card Holder (Permanent Resident)*, https://www.uscis.gov/green-card/after-we-grant-your-green-card/rights-and-responsibilities-of-a-green-card-holder-permanent-resident (last updated July 15, 2015) (describing rights of permanent residents to include the right to be "protected by all laws of the United States, your state of residence and local jurisdictions").

[4]*See* F.E.C. Website (providing that "a United States domestic corporation that is a subsidiary of a foreign corporation may establish and administer a separate segregated fund which can make contributions to federal candidates as long as . . . [a]ll decisions concerning the administration of the domestic subsidiary's separate segregated fund are made by U.S. citizens *or permanent residents*.) (emphasis added).  https://www.fec.gov/help-candidates-and-committees/foreign-nationals/.

can be employed in the United States without any additional paperwork.  LPRs can be found in communities small and large where they often work, raise families, and share in citizens' desire to support efforts that promote the general welfare of the communities in which they live. Considering these significant indicia of LPRs's enmeshment in their adopted home, it seems doubtful that stifling their First Amendment rights to participate in the very communities where they lawfully reside serves the interest of keeping foreign influences out of Ohio elections.  And notably, as regards the constitutional protection afforded contributions for ballot initiatives, the Supreme Court has observed that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) (juxtaposing limitations on contributions to and expenditures for specific candidates against similar limitations on ballot initiatives and recognizing that the latter "clearly impairs freedom of expression").

Understanding the majority's point that the empirical evidence required to satisfy heightened scrutiny varies with the novelty and plausibility of the justification raised, Ohio has still failed to meet this burden.  *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000). Indeed, defining LPRs as foreign nationals worthy of concern as it relates to protecting elections from foreign influence appears to be relatively novel.  The examples cited by the majority do not help.  Minnesota's § 211B.15(4)(a) does not include LPRs in its definition of "foreign investor." Minn. Stat. Ann. § 211B.15(4)(e) (providing that a "[f]oreign investor means a person or entity that . . .is . . . *an individual outside of the United States who is not a citizen or national of the United States and who is not lawfully admitted for permanent residence in the United States* . . . .") (emphasis added) (internal quotes omitted).  Similarly, the Bipartisan Campaign Reform Act (BCRA) did not extend its ban on contributions from foreign entities and nationals to LPRs. BCRA Pub. L. No. 107–155, § 303, 116 Stat. 81, 104. ("The committee shall not accept any donation from a foreign national (as defined in section 319(b) of the Federal Election Campaign Act of 1971)).[5]

---

[5]Further, the 25-year-old congressional bill referenced by the majority was never passed by Congress despite FECA having been amended and adjudicated several times since then.  Majority Op. at 15 n.2, 20.  To date, no legislative event has led to a change in the definition of foreign national to include lawful permanent residents.

Further, the cases cited by the majority do not implicate LPRs in the context of First Amendment speech for political advocacy. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 587-88, 592 (1952) (distinguishing between "advocating change in the existing order by lawful elective processes" (protected) and "advocating change by force and violence" (not protected) in rejecting  LPRs's claims of First Amendment protection from deportation law); *see also Bernal v. Fainter*, 467 U.S. 216, 220 (1984) (refusing to affirm "a wholesale ban against all [lawful permanent residents]" from notary positions in the context of equal-protection challenge); *Nyquist v. Mauclet*, 432 U.S. 1 (1977) (refusing to uphold a state statute barring noncitizens from certain scholarships in the context of equal-protection challenge); *Foley*, 435 U.S. at 300 (upholding a law barring foreign citizens from serving as police officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship in the context of equal-protection challenge); *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (upholding a law barring foreign citizens from working as probation officers in the context of equal-protection challenge).  So, the purported justification, as it relates to LPRs, is rather novel.[6]

Moreover, less burdensome alternatives exist. *Boone Cnty.*, 2024 WL 4048630, at *8; *see also Bonta*, 594 U.S. at 611 (2021).  Several examples demonstrate the ill fit between § 121 and the government's purported interest.  As earlier noted, the federal government has found a way to serve its interest in restricting foreign influence without excluding *every* iteration of foreign involvement in campaign finance.  Under FECA, LPRs are generally treated like citizens as it pertains to individual political contributions.  *See e.g.*, *Bluman*, 800 F. Supp. 2d at 288; *Kanchanalak*, 192 F.3d at 1048; 52 U.S.C. 30121(b).

---

[6]The majority suggests that requiring Ohio to provide more than speculation is to require "evidence of the obvious." Majority Op. at 18 n.4.  This ignores how legislatures and courts have historically treated LPRs and the rather straightforward requirement for the state to show that its "restriction on the speech at issue be 'actually necessary' to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (citing *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011)).  Absent such evidence, nothing is obvious about LPRs being the source of Ohio's concerns.  Speculative fear does not satisfy either intermediate or strict scrutiny. *McCutcheon*, 572 U.S. at 206.  We must respect the legislature's responsibility to legislate while also protecting the constitutional rights of those to whom they have been extended.  Abridging First Amendment freedoms requires some level of factual basis to support doing so. *Alvarez*, 567 U.S. at 725-26 (refusing to allow First Amendment restrictions purely on the basis of "common sense" and requiring the government point to "evidence to support its claim that" its proposed action furthers its interest in a meaningful way.).

In that same vein, LPRs are one of only two categories of individuals allowed to make expenditure- and campaign-contribution decisions for domestic corporations with foreign parent companies. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) (permitting the domestic subsidiaries of foreign companies to use their treasury funds to express advocacy through expenditures); 11 C.F.R. § 110.20. The majority minimizes the importance of the rights afforded LPR's, such as the opportunity to serve in the military and the responsibility to pay taxes by pointing out that their military service is accompanied by additional screening and anyone who works in the United States must pay taxes. Majority Op. at 12. But these observations are somewhat beside the point; the fact that LPRs share in various rights and responsibilities with U.S. citizens speaks to the showing of proportionality required to justify the admitted incursion the law visits upon their First Amendment rights. On that front, Ohio is unlikely to demonstrate that its addition of LPRs to the definition of foreign nationals is proportional to the interest being served.

*Domestic Organizations.* In addition to § 121's impact on LPRs, the law also unnecessarily expands First Amendment burdens to domestic advocacy organizations and nonprofits. Both the district court and the Ohio Education Association ("OEA") responding as amicus curiae point out that the ban on nonprofit organizations and unions is unconstitutional because it unnecessarily restricts the voices of organizations based on a minimal amount of funding they may receive from the relatively small portion of its membership comprised of LPRs and other noncitizens. As written, § 121 would burden the First Amendment rights of organizations that receive any amount of revenue from foreign nationals. Such burdening stands in contrast to the ways district courts have handled similarly situated organizations when the foreign contributions are minimal. *See Central Main Power Co. v. Maine Commission on Governmental Ethics & Election Pracs.*, No. 23-cv-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024) (enjoining law addressing foreign influence because the law would prohibit a substantial amount of protected speech despite only minimal foreign participation and because the law could not be reconciled with *Citizens United* as it would deprive U.S. citizen shareholders of their First Amendment right to engage in campaign spending.); *see also Minnesota Chamber of Commerce v. Choi*, 707 F. Supp. 3d 846 (D. Minn. 2023) (reaching the same conclusion about a law

banning expenditures and contributions if one foreign investor owned 1 percent or more of the company or two or more foreign investors owned 5 percent or more.).

In an apparent attempt to evade this flaw, § 121 draws a distinction between those nonprofit organizations and corporations. The majority and Ohio acknowledge the differences, here, but excuse them. Parsing the law this way, however, permits Ohio to seemingly honor the First Amendment rights of some—e.g. corporations with some foreign influence—but not others—e.g. domestic nonprofit organizations—even when they are similarly situated. It is unpersuasive that these organizations are so different from corporations, who can also make political contributions, that they should be treated differently pursuant to § 121. The OEA is correct that this is the very danger the First Amendment is meant to protect against—"allowing speech by some but not others." *Citizens United*, 558 U.S. at 340.

The majority asserts that crediting the OEA's argument leads to being "[o]verinclusive if you do, underinclusive if you don't." Majority Op. at 19. But that is not the case. The root of the problem with § 121 is its inclusion of LPRs in the first place, which in turn, implicates the rights of organizations to which they belong and contribute. And Ohio offers no clear answer to how these organizations, which sometimes have less than one percent of their contributions come from foreign interest, pose any greater threat to Ohio elections than corporations with more than one to five percent of their ownership composed of foreign interest.[7] For tailoring purposes, the answer to this question is meaningful. Dismissing the issue as simply a conundrum says nothing about the fit.

*United States Citizens.* There also remains the legitimate concern relating to joint accounts owned by both citizens and lawful permanent residents. The district court noted that "Plaintiff Peter Quilligan's situation illustrates the statute's overbreadth." (R. 32, Op. & Order,

---

[7]The majority's distinction between foreign influence from domestic corporations versus domestic non-profit organizations is puzzling. *See* Majority Op. at 22 n.5. Whether the influence be through foreign-investor-provided funding or foreign dues seems irrelevant to this analysis. As the district court noted in *Choi*, courts have limited the scope of legislation restricting the speech of organizations in the interest of limiting foreign influence to "corporations or associations that were created in foreign countries or funded predominately by foreign shareholders." *Choi*, 707 F. Supp. 3d at 860 (citing *Citizens United*, 558 U.S. at 362). The point here is that de minimis influence, whether that money be contributed through investments or dues, is not enough to justify chilling and abridging the freedom of speech of entities and individuals. *Id.* The organizations' respective abilities to segregate funds is a distinction of minimal consequence.

Page ID# 1182).   Quilligan is a citizen and is married to Plaintiff Elisa Bredendiek, a lawful permanent resident.  They share a joint bank account.  A plain reading of the statute suggests that "[i]f he were to expend or contribute with money from the joint bank account he shares with his . . . wife, then he would have violated Division C of Section 121."  (*Id.*).   True, the Ohio Administrative Code provides that "[a]bsent evidence to the contrary, any contribution made from a joint checking account or by other written instrument shall be reported as a contribution by the person signing or endorsing the joint check or other written instrument."  Ohio Admin. Code 111:2-4-14.  But how a contribution may be reported for administrative purposes does not directly address whether the contribution is lawful.

The words "[a]bsent evidence to the contrary" are freighted.  In briefing, Ohio does not clarify whether the person, a United States citizen, endorsing a check from a joint account will come under any civil or criminal scrutiny.  The law's phrasing certainly leaves open the possibility that Ohio will rigorously question the authenticity and accurateness of checks from joint accounts.  Accordingly, citizens could be pursued civilly or criminally for exercising their First Amendment rights to political speech.  Even if they are ultimately cleared of any wrongdoing, such state action is unnecessarily burdensome and could chill speech.

Each of the above examples demonstrate that § 121 is not narrowly tailored to the state's compelling interest because less burdensome alternatives for restricting foreign influence over the political process exist.  Accordingly, this law appears unlikely to pass strict scrutiny.  The same examples demonstrate that § 121 also is not closely drawn to the actual interest it is meant to serve.  *Buckley*, 424 U.S. at 42 (holding that interferences in First Amendment association requires a State demonstrate "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.");  *Schickel*, 925 F.3d at 873 (6th Cir. 2019) (explaining that closely drawn requires "a fit…that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'"  (quoting, *McCutcheon*, 572 U.S. at 218 (2014))).  *Citizens United*, 558 U.S. at 327 ("First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech.") (internal quotes omitted).

As the district court aptly noted, it is "absurd to allow (or force) [lawful permanent residents] to fight and die for this country, on the one hand, and to prohibit them from making incidental expenditures for a yard-sign that expresses a view on state or local politics, on the other." (R. 32, Op. & Order, Page ID# 1182). And it is not apparent how the remaining provisions of § 3715.121 inadequately remedy at least some of the government's stated concerns; a foreign national corporation is no more able to give money to a lawful permanent resident than to a citizen. *See* Ohio Rev. Code § 3517.121(A)(2), (B), (C), (D).

The above-noted instances of exclusion of LPRs from expenditure restrictions in federal law raise the question whether this class of noncitizens wields the corrupting influence Ohio's law seeks to tackle. Since the interest of limiting foreign influence in Ohio's political process can be met without abridging the rights of an entire category of right-holders, it is difficult to say that it is closely drawn.

## III.

The remaining factors do not change the result here. *Thompson v. Dewine*, 959 F.3d 804, 807–08 (6th Cir. 2020) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)) ("When evaluating [the stay] factors for an alleged constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'"). Any irreparable injury to Ohio rests on whether the law it seeks to enforce is constitutional. *See Thompson*, 959 F.3d at 812 ("Unless the statute is unconstitutional, enjoining a state from conducting its elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm the state.") (cleaned up). The answer to such a question necessarily circles back to Ohio's likelihood of success on the merits when the constitutionality of the law is being challenged. Similarly, the "merged" third and fourth factors offer no help. *Nken*, 556 U.S. at 435. The government has no interest in enforcing unconstitutional laws, and "[l]ikewise, the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Thus, Ohio's low likelihood success on the merits counsels against issuing a stay.

IV.

Lastly, the *Purcell* principle likely does not apply here. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). Ohio asserts that *Purcell* applies in its favor, noting that both this court and the Supreme Court have stayed injunctions of state laws regarding signature requirements for ballot-initiative petitions. (Doc. 15, Mot., 6–7 (citing *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Thompson,* 959 F.3d 804 (6th Cir. 2020) (order) (per curiam)).

However, this case shares more in common with *Boone Cnty.*, where this court—without regard to *Purcell*—enjoined the Kentucky agency tasked with investigating and prosecuting campaign-finance violations from enforcing its advisory opinion against plaintiff-executive committees for raising or expending funds in support of a constitutional amendment on the November ballot. 2024 WL 4048630; *but see Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (granting a stay pending appeal of the district court's injunction enjoining Montana from enforcing its campaign contribution limits).

The core concerns underlying *Purcell* relate to the "risk of voter confusion and the unfairness of unexpected administrative burdens." *Tenn. Conf. of the NAACP*, 105 F.4th at 897. A law not even touching voting rights—or seeking to regulate voters for that matter—does not address those concerns.

*** 

Because Ohio has not shown that it is likely to demonstrate a strong likelihood of success on the merits, I would deny a stay of the district court's injunction.